967 F.2d 404
 1992-1 Trade Cases P 69,871
 Carey F. SHARP, et al., Plaintiffs-Appellants,
v.
UNITED AIRLINES, INC., and Does 1 through 10, Defendants-Appellees.
Nina M. ABBOTT, et al., Plaintiffs-Appellants,
v.
UNITED AIRLINES, INC., a Delaware corporation, and John Does
1-25, Defendants-Appellees.
 Nos. 91-1230, 91-1231.
 United States Court of Appeals,
Tenth Circuit.
 June 17, 1992.
 
 Kenneth A.B. Roberts, Jr., Kenneth A. Roberts, P.C., Denver, Colo., for plaintiffs-appellants, Sharp, et al.
 Craig W. Donaldson (John S. Retrum, with him on the briefs), Retrum Retrum & Donaldson, Lakewood, Colo., for plaintiffs-appellants, Abbott, et al.
 Henry C. Thumann, O'Melveny & Myers, Los Angeles, Cal. (Wallace M. Allan, Bernard C. Barmann, Jr., O'Melveny & Myers, Los Angeles, Cal., and Andrew J. Petrie and Rich L. Bethke, Kirkland & Ellis, Denver, Colo., with him on the brief), for defendant-appellee, United Airlines.
 Before LOGAN, ANDERSON, Circuit Judges, and THEIS,* District Judge.
 STEPHEN H. ANDERSON, Circuit Judge.
 
 
 1
 In this consolidated appeal,[1] plaintiffs, a group of former pilots, flight attendants, ticket agents, reservation agents, and station agents for Frontier Airlines, appeal from the dismissal of their federal and state antitrust claims, as well as state law claims for breach of contract and tortious interference with prospective business advantage or economic opportunity. Plaintiffs had alleged that defendant United Airlines had engaged in anticompetitive activity which caused Frontier to fail, thereby causing injury to plaintiffs. We affirm the dismissal of plaintiffs' claims.
 
 BACKGROUND
 
 2
 Only a few facts are relevant to our disposition of this case. Frontier had competed with United in the air transportation market served by each airline's hub operations at Stapleton International Airport in Denver, Colorado. As part of its operations, United maintained a Computerized Reservation System ("CRS") known as Apollo, in which Frontier, by contract, participated. A CRS such as Apollo consists of computer terminals located in subscribing travel agents' places of business, and which permits booking and selling of tickets on various airlines. The Apollo system was available to subscribing travel agents for a fee, and it permitted booking and sales of tickets on both United and Frontier Airlines. Apollo is one of a number of CRSs.
 
 
 3
 Part of plaintiffs' antitrust allegations involve the Apollo system. Plaintiffs argue that United has monopoly power in the CRS market in Denver, and also as to its own Apollo system, and that it overcharged Frontier for its participation in the Apollo system and caused Apollo to operate unfairly in its ticket sales, to the benefit of United and the detriment of Frontier. This, plaintiffs allege, weakened Frontier's position in the air transportation market.
 
 
 4
 Plaintiffs' allegations also involve United's purchase of certain assets from Frontier at two different times, as well as its agreement, which was never fulfilled, to purchase Frontier's stock from Frontier's owner at the time, People Express Airlines. Plaintiffs argue that all the asset sales were distress sales made by Frontier at less than fair market value, and that United purposefully did not go through with the stock purchase agreement. They allege that the entire transaction, following the damage done to Frontier through United's manipulation of the Apollo system, left Frontier so weakened financially that it failed.
 
 
 5
 On August 24, 1986, Frontier suspended operations. Two days later it filed for bankruptcy. Plaintiffs accordingly lost their jobs. They argue that, as a result, they suffered loss of employment wages, loss of employment benefits, and loss of employment contributions. Plaintiffs assert that United's conduct amounted to a violation of sections 1 and 2 of the Sherman Act and sections 2 and 3 of the Clayton Act. They asserted state antitrust claims, as well as breach of contract claims and a claim that United had intentionally interfered with plaintiffs' prospective business advantage by diverting passengers away from Frontier to United through manipulation of the Apollo system.
 
 
 6
 United filed a motion to dismiss under Rule 12(b)(6). After a hearing, the district court granted the motion and entered an order dismissing the action.
 
 DISCUSSION
 
 7
 We review de novo the sufficiency of a complaint. Ayala v. Joy Mfg. Co., 877 F.2d 846, 847 (10th Cir.1989). "We will uphold a dismissal [under Fed.R.Civ.P. 12(b)(6) ] only when it appears that the plaintiff can prove no set of facts in support of the claims that would entitle the plaintiff to relief." Jacobs, Visconsi & Jacobs, Co. v. City of Lawrence, 927 F.2d 1111, 1115 (10th Cir.1991) (citing Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)). In making this determination, we must "accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." Williams v. Meese, 926 F.2d 994, 997 (10th Cir.1991). Even under this strict standard, we must affirm the dismissal of plaintiffs' action.
 
 
 8
 United argues (1) plaintiffs lack standing to pursue their federal and state antitrust claims; and (2) plaintiffs' breach of contract claims and intentional interference claims fail because they fail to allege crucial elements of each claim.
 
 
 9
 "Standing and antitrust injury are essential elements in § 4 Clayton Act damage actions." City of Chanute v. Williams Natural Gas Co., 955 F.2d 641, 652 n. 14 (10th Cir.1992); see also Cargill, Inc. v. Monfort, Inc., 479 U.S. 104, 110, 107 S.Ct. 484, 489, 93 L.Ed.2d 427 (1986); Associated Gen. Contractors, Inc. v. California State Council of Carpenters, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983); Reazin v. Blue Cross & Blue Shield of Kansas, Inc., 899 F.2d 951, 961 (10th Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 3241, 111 L.Ed.2d 752 (1990). While the two concepts are closely linked, they are nonetheless distinct. As we acknowledged in City of Chanute, "[s]tanding cannot be established without an antitrust injury, but the existence of an antitrust injury does not automatically confer standing." 955 F.2d at 652 n. 14; see also Adams v. Pan American World Airways, Inc., 828 F.2d 24 (D.C.Cir.1987) (although former employees of defunct airline alleged antitrust injury, they were denied standing), cert. denied, 485 U.S. 961, 108 S.Ct. 1225, 99 L.Ed.2d 425 (1988).
 
 
 10
 While the Supreme Court has avoided black-letter rules about antitrust standing, it has enumerated factors to be considered in evaluating standing: (1) the causal connection between the antitrust violation and the plaintiff's injury; (2) the defendant's intent or motivation; (3) the nature of the plaintiff's injury--i.e. whether it is one intended to be redressed by the antitrust laws; (4) the directness or the indirectness of the connection between the plaintiff's injury and the market restraint resulting from the alleged antitrust violation; (5) the speculative nature of the damages sought; and (6) the risk of duplicative recoveries or complex damages apportionment. See Cargill, Inc. v. Monfort, Inc., 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1987); Associated Gen. Contractors, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983); Blue Shield v. McCready, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982); Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); City of Chanute, 955 F.2d at 652 n. 14; Reazin, 899 F.2d at 962 n. 15.[2]
 
 
 11
 Applying those factors, as well as Tenth Circuit precedent pre-dating those Supreme Court cases but incorporating similar factors, we conclude plaintiffs lack standing.
 
 
 12
 I. Antitrust Injury.
 
 
 13
 Plaintiffs rely on dicta from a single circuit court opinion, Adams v. Pan American World Airways, Inc., supra, for their argument that they have alleged an antitrust injury. Adams is remarkably similar to this case. The Adams plaintiffs were former employees (pilots, flight attendants, managers, administrators, reservation agents, engineers, mechanics and shop personnel) of Laker Airways Limited. They alleged that a group of airlines, an aircraft manufacturer and the manufacturer's subsidiary conspired to drive Laker out of business, thereby depriving them of their jobs. 828 F.2d at 25. While the court concluded that plaintiffs had alleged an antitrust injury, it declined to allow plaintiffs standing, holding that the other relevant factors clearly compelled a finding of no standing.
 
 
 14
 In our view, the Adams court's dicta regarding antitrust injury is contrary to Tenth Circuit precedent, as well as the Supreme Court guidelines established in Associated General Contractors and its other antitrust standing cases. On two prior occasions, this court has addressed employee standing to assert antitrust claims arising out of some harm to the employer. In Reibert v. Atlantic Richfield Co., 471 F.2d 727 (10th Cir.), cert. denied, 411 U.S. 938, 93 S.Ct. 1900, 36 L.Ed.2d 399 (1973), an employee sought treble damages under the Clayton Act for his loss of employment following an allegedly unlawful merger between his employer, Sinclair Oil Corporation, and Atlantic Richfield Company. At that time, this circuit reviewed antitrust standing in terms of a two-part test, which incorporates the same basic factors as the Supreme Court's subsequent multi-factor test in Associated General Contractors and other cases.[3] Thus, we observed that plaintiff Reibert needed to show that:
 
 
 15
 (1) there is a causal connection between an antitrust violation and an injury sufficient to establish the violation as a substantial factor in the occurrence of damage; and (2) that the illegal act is linked to a plaintiff engaged in activities intended to be protected by the antitrust laws.
 
 
 16
 Reibert, 471 F.2d at 731.
 
 
 17
 We held that an employee such as Reibert met neither of those requirements. In so holding, we observed that "[s]alaried employees ... are not within the area of competitive economy protected against unlawful mergers." Id. at 732. We further observed, "[Reibert's] termination of employment does not affect the area legislatively protected. At best, appellant's discharge was no more than an outgrowth of the alleged unlawful merger.... [He] is not in the area of economy endangered by a breakdown of competitive conditions." Id. He therefore lacked standing to sue.
 
 
 18
 This principle was followed and reiterated in Jones v. Ford Motor Co., 599 F.2d 394 (10th Cir.1979), in which we stated, "[i]t is settled law that shareholders and employees do not have standing to sue for antitrust violations that injure a corporation." Id. at 397. Despite plaintiffs' argument that Reibert and Jones stand only for the proposition that an employee may not sue his or her employer for antitrust violations, we perceive no limitation in the clear and well-reasoned basis for the broad principle expressed in those cases, that employees simply cannot establish an antitrust injury when they lose their employment as a result of some allegedly anticompetitive activity directed at or involving their employer.[4]
 
 
 19
 The result of Reibert and Jones is supported and validated by the Supreme Court's analysis of the necessity of proving antitrust injury. As we have observed before:
 
 
 20
 [O]nly antitrust injuries are redressable under section 4. An antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendant's acts unlawful." An injury which is merely causally linked in some way to an alleged antitrust violation is insufficient.
 
 
 21
 Reazin, 899 F.2d at 962 n. 15 (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977)); see also Associated General Contractors, 459 U.S. at 538, 103 S.Ct. at 908 ("our prior cases have emphasized the central interest in protecting the economic freedom of participants in the relevant market."). Plaintiffs here allege that United committed various antitrust violations which affected the CRS and the Apollo markets, as well as the "city pair" air transportation markets, in Denver. Their asserted injury, various losses stemming from their loss of employment, is tangential to any alleged harm in those markets. It may be causally linked in some sense to United's anticompetitive behavior in those markets, but it is not necessarily the result or manifestation of a reduction in competition. It is at most an indirect consequence of the demise of an individual competitor.[5]
 
 
 22
 Accordingly, to the extent the Adams court's dicta stands for the bold proposition that employees of an airline allegedly driven into bankruptcy by competitors who violated the antitrust laws automatically have established an antitrust injury because of their loss of employment, we reject it as contrary to Supreme Court and Tenth Circuit precedent.
 
 
 23
 Moreover, even were we to assume plaintiffs have alleged an antitrust injury sufficient to survive a 12(b)(6) motion to dismiss, we would hold, as did the court in Adams, that the other factors relevant to standing doom plaintiffs' claims.
 
 
 24
 II. Directness or Indirectness of Injury.
 
 
 25
 The Adams court correctly held that any injury plaintiffs suffered in that case was indirect. The court observed:The conspirators allegedly forced Laker to its knees. Whenever that happens to a firm, the web of contracts and relationships which form the essence of the firm will be dismantled. Astute counsel should not be able, merely by feats of characterization, to confer standing on all participants in that web.
 
 
 26
 However the final dismissal may be labelled, the harm to plaintiffs is one step removed from the harm to Laker.
 
 
 27
 Adams, 828 F.2d at 28. After surveying the case law, the court concluded "the cases provide no support for suit by employees of a firm victimized by antitrust violations." Id. at 29.[6]
 
 
 28
 We agree with the Adams' court's analysis. Furthermore, it is completely consistent with Reibert and Jones from this circuit. Indeed, in Jones, we specifically stated:
 
 
 29
 While Section 4 of the Clayton Act was worded broadly to effect Congress' intentions to encourage sanction against antitrust violations wherever possible, the right of action is limited to those directly injured by the anti-competitive behavior. Thus, even though there are losses of a job with a corporation and upon an investment in stock this is not regarded the direct injury against which the treble damages action was aimed.
 
 
 30
 599 F.2d at 397 (citation omitted). See also Reibert, 471 F.2d at 731 ("If there is any antitrust violation, it is directed toward the petroleum industry.... The first element, causal connection between violation and injury, is lacking because [Reibert] cannot show that any antitrust violations directly injured him.").
 
 
 31
 Similarly, plaintiffs injuries here are at most indirect. Plaintiffs' mere assertion that they are the direct victims of United's anticompetitive scheme is insufficient to convince us otherwise. See Air Courier Conference of America v. American Postal Workers Union, --- U.S. ----, 111 S.Ct. 913, 920 n. 5, 112 L.Ed.2d 1125 (1991) ("Employees have generally been denied standing to enforce competition laws because they lack competitive and direct injury."); Associated General Contractors, 459 U.S. at 541, 103 S.Ct. at 910 (in denying union standing to argue that multiemployer association and its member coerced third parties and some association members to enter into business relationships with non-union firms, thereby restraining union's business activities, the Court observed "a number of decisions have denied standing to employees with merely derivative injuries.").
 
 
 32
 Were we to permit standing in this case, there would be no principled way to cut off a myriad of other indirect claimants, such as suppliers of Frontier Airlines or creditors, each of whom could claim that their business was somehow impacted or adversely affected by Frontier's demise.
 
 
 33
 III. Speculativeness of Damages.
 
 
 34
 The Adams court similarly rejected plaintiffs' arguments in favor of standing on the additional ground that their damages were speculative. Not only is it uncertain what effect on plaintiffs' wages the reduction in the number of airlines would have, plaintiffs' economic fate is specifically tied to their own employer-airline.
 
 
 35
 [W]e cannot assume [an airline's] indefinite survival in an exceptionally volatile industry characterized by frequent mergers and bankruptcies. Further, the prosperity of each of the ... plaintiffs would depend on how long he or she would have remained with [the airline], with what advancement, what salary increases, etc. Finally, the court would need to consider each plaintiff's prospects of obtaining comparable employment in aviation or other industries.
 
 
 36
 Adams, 828 F.2d at 30 (citation omitted). That analysis applies with equal force in this case. Plaintiffs attempt to circumvent those difficulties by asserting that Frontier has a ten-year history of profitable performance from which to somehow measure their damages. That in no way diminishes the difficulty of trying to calculate plaintiffs' damages.
 
 
 37
 IV. Duplicative Damages.
 
 
 38
 Finally, it is clear that here, as in Adams, there is a risk of duplicative recoveries or the necessity of apportioning damages if plaintiffs are allowed standing. See Associated Gen. Contractors, 459 U.S. at 544-45, 103 S.Ct. at 912; Illinois Brick Co. v. Illinois, 431 U.S. 720, 730-31, 735-48, 97 S.Ct. 2061, 2069-76, 52 L.Ed.2d 707 (1977); Adams, 828 F.2d at 30-31.
 
 
 39
 V. State Law Claims.
 
 
 40
 Plaintiffs argue that, despite dismissal of their complaint for lack of standing under the federal antitrust laws, we should nonetheless permit their state law antitrust claims and their other state law claims to go forward. The district court held that the same standing analysis applied to plaintiffs' state antitrust claims, and dictated dismissal of those claims. It further held that:
 
 
 41
 [T]he plaintiffs are not beneficiaries of the two contracts that are involved, and ... the doctrine of interference with prospective business advantage or economic opportunity is not applicable to employees but is limited to those who are in business in the more traditional sense of being entrepreneurs.
 
 
 42
 Appendix to Appellants' Consolidated Opening Brief at 144. Plaintiffs' cursory arguments do not convince us that the district court erred. We therefore affirm those conclusions.
 
 
 43
 For the foregoing reasons, we AFFIRM the district court's dismissal of plaintiffs' action pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim.
 
 
 
 *
 The Honorable Frank G. Theis, Senior Judge, United States District Court for the District of Kansas, sitting by designation
 
 
 [1]
 Plaintiffs in case 91-1230 are former Frontier Airline pilots. Plaintiffs in 91-1231 are former Frontier flight attendants, ticket agents, reservation agents and station agents
 
 
 [2]
 Our circuit has sometimes formulated the antitrust standing issue in terms of a two-part test: whether there was an antitrust injury--i.e., an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful," Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977); and whether the antitrust injury resulted directly from the antitrust violation. See City of Chanute, 955 F.2d at 652; Motive Parts Warehouse v. Facet Enters, 774 F.2d 380, 389 (10th Cir.1985); Farnell v. Albuquerque Publishing Co., 589 F.2d 497, 500 (10th Cir.1978); Reibert v. Atlantic Richfield Co., 471 F.2d 727, 731 (10th Cir.), cert. denied, 411 U.S. 938, 93 S.Ct. 1900, 36 L.Ed.2d 399 (1973). The factors enumerated in the line of Supreme Court cases cited above validate but give more specificity to the inquiry mandated by the two-part test
 
 
 [3]
 See note 2 supra
 
 
 [4]
 The Reibert and Jones cases do recognize that a different result may be reached when plaintiff-employees are in essence "quasi-businessmen operating in a market carved out by their own aggressiveness and salesmanship qualities. Thus when their employers engaged in anti-competitive practices, the employees were directly injured by these violations." Reibert, 471 F.2d at 730. Reibert similarly distinguished cases in which antitrust violations were "directed against the blackballed party," such as when a football or baseball player was prevented from obtaining employment. Id. at 730-31. Such is not the case here, where plaintiffs' injury is tangential to the direct injury allegedly suffered by Frontier. And, plaintiffs' efforts to characterize themselves as the direct victims of anticompetitive activity is unavailing when it is clear that the direct victim was their employer, Frontier
 
 
 [5]
 Indeed, as the Adams court acknowledged, the effect on airline industry employees of a reduction in competition in that industry is unclear. That fact supports our conclusion that plaintiffs' loss of employment is not necessarily linked to the degree of competition in the industry
 
 
 [6]
 Furthermore, the Adams court observed "superior plaintiffs clearly exist--both Laker itself and consumers of transatlantic air transportation." 828 F.2d at 29. That is equally true in this case